**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1191**

SUE DOE,

                Plaintiff - Appellant,

        v.

LINDA KIDD; STAN BUTKUS; KATHI LACY; SOUTH CAROLINA
DEPARTMENT OF DISABILITIES AND SPECIAL NEEDS; ROBERT KERR;
SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES,

                Defendants – Appellees,

        v.

SANDRA RAY,

                Guardian ad Litem Plaintiff.

Appeal from the United States District Court for the District of
South Carolina, at Columbia.   Margaret B. Seymour, District
Judge.   (3:03-cv-01918-MBS)

Argued:  December 8, 2010          Decided:  March 24, 2011

Before MOTZ, KING, and GREGORY, Circuit Judges.

Reversed in part, affirmed in part, and remanded with
instructions by unpublished opinion.  Judge Gregory wrote the
opinion, in which Judge Motz and Judge King joined.

**ARGUED:** Patricia L. Harrison, Columbia, South Carolina,
for Appellant.  Kenneth Paul Woodington, DAVIDSON & LINDEMANN,

PA, Columbia, South Carolina, for Appellees. **ON BRIEF:** William H. Davidson, II, DAVIDSON & LINDEMANN, PA, Columbia, South Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Sue Doe, the plaintiff-appellant, is a young woman with developmental disabilities, including epilepsy, mild mental retardation, and cerebral palsy. She filed this 42 U.S.C. § 1983 action against the South Carolina Department of Disabilities and Special Needs ("DDSN"), the South Carolina Department of Health and Human Services ("DHHS"), as well as Linda Kidd, Stan Butkus, Kathi Lacy and Robert Kerr, in their official capacities as state administrators (collectively, "Defendants"). The suit alleges that Defendants violated various sections of the Medicaid Act related to the provision of services. In an earlier appeal, Doe v. Kidd, 501 F.3d 348 (4th Cir. 2007) ("Doe I"), this Court affirmed in part, and reversed in part the district court's grant of summary judgment for Defendants. Only one of Doe's original claims survived that appeal, her allegation that Defendants had not complied with the reasonable promptness provision of the Medicaid Act. Id. at 357.

On remand, the district court again granted summary judgment in favor of Defendants. Doe subsequently filed this timely appeal challenging (1) the dismissal of her reasonable promptness claim; (2) the denial of her motion to amend the complaint; and (3) the denial of her request for attorney's

fees.[1]  Because we find that Defendants have violated Doe's rights under the Medicaid Act as a matter of law, we reverse the district court and grant summary judgment in her favor. Accordingly, Doe may recover attorney's fees.  However, the district court properly denied her motion to amend.

I.

We review a grant of summary judgment de novo, and present all facts and reasonable inferences in the light most favorable to the nonmoving party.  Varghese v. Honeywell Int'l, Inc., 424 F.3d 411, 416 (4th Cir. 2005).  The underlying material facts are not in dispute, and the extensive history of this case is laid out in further detail in our previous opinion.  See generally Doe I, 501 F.3d at 351-53.  DHHS is the South Carolina state agency responsible for administrating Medicaid programs. DDSN supervises the treatment and training of South Carolinians

---

[1] Doe makes passing references in her opening brief to the district court's orders granting Defendants' motion for a protective order and limiting discovery.  (See, e.g., Appellant's Br. at 1.)  But nowhere in the body of her brief does she present any legal argument in support of her assertions that the district court was in error as to these discovery matters.  Federal Rule of Appellate Procedure 28(a)(9)(A) requires that the argument section of an appellant's opening brief contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."  Because Doe has failed to adhere to this fundamental rule, she has abandoned these challenges on appeal.

4

with mental retardation and related disabilities.  Because South Carolina accepts Medicaid funding, these agencies are bound to comply with all related federal laws and regulations.  Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990).

In July 2002, after unsuccessfully applying twice in the past, Doe filed a third application for DDSN services under the Medicaid waiver program pursuant to 42 U.S.C. § 1396n(c) (2000), whereby a state may waive the requirement that persons with mental retardation or related disabilities live in an institution in order to receive certain services.  The waiver application process has three steps:  first, DHHS needed to decide whether Doe was eligible for any Medicaid funding; next, DDSN was required to evaluate Doe to determine what services she was entitled to; and, finally, DDSN had to decide the most appropriate "level of care" for Doe as well as the least restrictive environment or care setting.  These settings may include, listed in order of the least to the most restrictive placement: (1) a Supervised Living Program II ("SLP II"), an apartment where recipients of DDSN services reside together; (2) a Community Training Home I ("CTH I"), a private foster home where a services recipient resides with a family, one member of whom is a trained caregiver; or (3) a Community Training Home II ("CTH II"), a group home with live-in caregivers for four or fewer recipients.  Appeals from DDSN decisions are taken to a

DHHS hearing officer and thereafter may be appealed to a South Carolina administrative law judge.

In December 2002, without having made a final decision as to Doe's eligibility for a waiver, DDSN placed Doe on the waiver program's non-critical waiting list. Doe appealed this decision to DHHS, and claimed that DDSN had failed to provide her with services within a reasonably prompt time frame as required by federal regulations. Pending that appeal, DDSN moved Doe to its critical waiting list in February 2003. Doe was advised that she met certain DDSN eligibility requirements in March 2003. She was then moved to the top of the critical waiting list.

At a March 2003 hearing on the appeal, a DHHS hearing officer dismissed the matter. He found that, by moving Doe to the top of the critical waiting list and determining that she was eligible for services, DDSN had resolved all of Doe's claims in her favor. The hearing officer also found that DDSN had not provided Doe with services in a "reasonably prompt" period of time. However, because DDSN was then promising to provide Doe with services, the hearing officer found that he lacked the power to provide any other relief and the appeal was dismissed. Joint Appendix ("J.A.") 887-89.

In April 2003, DDSN approved a "plan of care" that was developed for Doe pursuant to 42 C.F.R. § 441.301(b) (hereinafter the "2003 plan"). J.A. 616-44. The 2003 plan

6

included a regime of personal care, psychological evaluations, and other services to be provided in-home at the residence of Doe's mother. It also recommended that Doe "receive residential habilitation from a DDSN approved provider" within three months at a "setting located within the Columbia area to be chosen by her family." J.A. 625.

In May 2003, in response to the declining mental health of Doe's mother, Doe asked to terminate the in-home services and, per the 2003 plan, receive "residential habilitation services" in either a CTH I or CTH II. J.A. 920, 923. In June 2003, after failing to receive any residential habilitation services, Doe initiated this action, wherein she accused Defendants of violating the Medicaid Act. She sought injunctive relief from DDSN, the payment of medical expenses, and attorney's fees.

In a letter dated June 26, 2003, DDSN authorized CTH I or SLP II services for Doe at a residential center (hereinafter the "authorization letter"). J.A. 942-44. According to the authorization letter, an assessment of Doe by DDSN revealed that her needs for "out-of-home placement/residential habilitation supervision, care and skills training" could be met at either of these two placements. J.A. 943. However, Doe rejected the DDSN chosen provider, the Babcock center, because she believed that the facility could not safely provide her with appropriate services. Through August 2003, Defendants and Doe discussed

7

some alternative placements, including the possibility of upgrading the services at another CTH I setting or placement at a CTH II facility closer to her family. J.A. 1689. However, Defendants also maintained that a CTH I setting "represents the best long-term option" for Doe. Id. In an August 16, 2003 letter, DDSN gave Doe permission to reside in a CTH II facility, where she would receive "respite" or temporary services. J.A. 74. As of December 2010, Doe continues to reside in a CTH II facility.

In February 2005, DDSN reevaluated Doe's eligibility for Medicaid services. Based upon this reevaluation, DDSN now maintains that Doe is not mentally retarded and, therefore, is ineligible for the waiver program. J.A. 1208-09. According to Doe, the reevaluation was initiated in retaliation for her filing of this lawsuit. J.A. 105-06. She also believes it contradicts the Social Security Administration's prior determination that Doe is mentally retarded, and the similar longstanding diagnosis of Doe's physicians. J.A. 93-106. Doe administratively appealed this reevaluation. J.A. 1207. However, both a DHHS hearing officer and a state administrative law court judge agreed with DDSN. See generally Pruitt v. South Carolina Dep't of Health and Human Serv., No. 06-ALJ-08-0605-AP, 2008 WL 2828634 (S.C. Admin. L. Ct. June 20, 2008). The matter is now pending before the South Carolina Court of Appeals.

In February 2008, on remand, with only her reasonable promptness claim properly before the district court, Doe moved to amend her complaint. J.A. 77. The amended complaint would have added three causes of action based on the Supremacy Clause of the Constitution and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. J.A. 106-15. These new causes of action would draw into the federal action Doe's state court challenges to Defendants' reevaluation, as well as again dispute Defendants' right to decide whether Doe is entitled to CTH I or CTH II services. The court denied her motion to amend.

On April 21, 2009, Defendants filed a motion for partial summary judgment on the issue of damages. The court granted that motion in a short text order on August 19, 2009.

On May 14, 2009, Plaintiffs also filed a motion for summary judgment, and, that same day, Defendants filed a second motion for summary judgment on all remaining issues in the case. Following opposition and reply briefs on these motions, the district court held a hearing on May 21, 2009.

On January 29, 2010, the district court dismissed Doe's reasonable promptness claim. J.A. 17-23. Specifically, the court held that Defendants are not obligated under the Medicaid Act to provide or pay for the specific residential habilitation services from the 2003 plan with reasonable promptness. J.A. 22-23 (citing Bruggeman ex rel. Bruggeman v. Blagojevich, 324

9

F.3d 906, 910 (7th Cir. 2003)). The court dismissed her reasonable promptness claim because Defendants had promptly and continuously met their obligation to pay for some residential habilitation services. It held that, even though the services funded by Defendants were not the same ones called for in the 2003 plan and the authorization letter, the Medicaid Act did not actually require Defendants to provide any specific services, only to pay for some unspecified ones. J.A. 23. The court then added, speaking to the issues Doe attempted to raise related to her state administrative appeal, that her "challenge to DDSN's level of care and placement decisions must be made through the administrative procedures available to her in state court."

## II.

We disagree with the district court. Defendants' failure to provide Doe with those residential habilitation services described in her 2003 plan in a reasonably prompt manner constituted a violation of the Medicaid Act. Thus, we grant summary judgment in favor of Doe and find that, as the prevailing party, she is entitled to attorney's fees. We affirm the denial of her motion to amend the pleadings.

### A.

The sole issue to survive the prior appeal is whether the requisite medical services were provided to Doe in a reasonably

10

timely manner.  <u>Doe I</u>, 501 F.3d at 360.  Thus, despite Doe's attempts to raise various issues related to the 2005 Medicaid eligibility determination, here, we must decide only that single, very narrow issue.

Under the Medicaid Act, "[a] State plan for medical assistance must -- provide that all individuals wishing to make application for medical assistance under the plans shall have opportunity to do so, and such assistance shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).  These provisions are "clear" and therefore establish rights under the Medicaid Act that are enforceable through § 1983.[2]  <u>Doe I</u>, 501 F.3d at 356-57.

It is undisputed that Doe applied for services in 2002, and qualified for CTH I residential habilitation services in June 2003.  However, Defendants claim that she is not entitled to any relief because (1) they offered her a CTH I placement in June

---

[2]  Defendants argue that <u>Doe I</u> misapplied 42 C.F.R. § 435.911, which appears to establish a timeline whereby a state agency must make a determination as to eligibility, but not a timeline for when an agency must actually furnish services. (Appellees' Br. at 39-40.)  They would have us instead rely upon § 435.930, which states only that Medicaid services are to be made available "without any delay caused by the agency's administrative procedures."  <u>See, e.g.,</u> <u>Doe 1-13 By and Through Doe, Sr. 1-13 v. Chiles</u>, 136 F.3d 709, 721-22 (11th Cir. 1998) (upholding a district court's conclusion that "reasonable promptness" means a period not to exceed ninety days).  Because we find that Defendants have never provided Doe with the appropriate services, we will not address these more subtle issues of timeliness.

11

2003, which she then turned down; and (2) because, Defendants have financed CTH II respite services since July 2003, they are not required to find a suitable CTH I residential habilitation placement for Doe. Alternatively, Defendants argue that, here, Doe has only appealed the district court's order on Defendants' motion for summary judgment on the remaining issues, not its grant of partial summary judgment as to damages. Thus, they believe, even if we were to find in her favor, she cannot obtain any meaningful relief.

i.

Contrary to what the district court held and Defendants now argue, after Doe rejected the CTH I services offered in June 2003, Defendants were still obligated to present her with alternative CTH I services within a reasonably prompt period of time. Although this Court dismissed Doe's freedom of choice claim, finding that she had no right to choose between CTH I and CTH II services, we did note that Doe retains a "choice of providers, so long as the provider operates a CTH I facility, the kind of setting DDSN has determined would constitute the least restrictive environment for Doe." Doe I, 501 F.3d at 360. In fact, § 1396a(a)(23) of the Medicaid Act "is clearly drawn to give Medicaid recipients the right to receive care from the Medicaid provider of their choice, rather than the government's

12

choice."[3]  Silver v. Baggiano, 804 F.2d 1211, 1217 (11th Cir. 1986).

The district court, in granting summary judgment for Defendants relied upon the Seventh Circuit's definition of "medical assistance" in 42 U.S.C. § 1396a(a)(8).  In Bruggeman, the plaintiffs sought a court order requiring Illinois to build and operate facilities for the provision of actual medical services for Medicaid recipients in the northern part of the state.  324 F.3d at 909.  Narrowly construing the phrase "medical assistance," the Seventh Circuit held that it is a reference to "financial assistance rather than to actual services."  Id. at 910 (emphasis added).  The Seventh Circuit therefore held that Illinois was only required to pay for appropriate medical services, and was not obligated to actually construct hospitals or manage medical care.  Id. at 910-11.

Unlike the district court, we cannot see how our adoption of Bruggeman would change the outcome of this case.  Even

---

[3] 42 U.S.C. § 1396a(a)(23) states, in relevant part, that "A State plan for medical assistance must provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services, and (B) an enrollment of an individual eligible for medical assistance . . . shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title, except as provided in subsection (g) of this section and in section 1396n of this title . . . ."  (emphasis added).

assuming we were to agree with the Seventh Circuit, Defendants obligations as to Doe, the 2003 plan, and the authorization letter would not change.  As we outlined in Doe I, the Medicaid program requires Defendants to "select[] the appropriate setting for the provision of waiver services. Once a setting is selected, recipients have a choice of qualified providers among those who offer services in the setting DDSN has approved."  501 F.3d at 359.  Bruggeman itself also suggests that the distinction Defendants try to draw between duties to provide funding-for-care versus actual-direct-care is of no importance here, since the Medicaid regulations ensure the "prompt provision of funds to eligible individuals to enable them to obtain the covered medical services that they need . . . ."  324 F.3d at 910-11 (emphasis added).  It therefore cannot suffice that Defendants have paid for another, albeit similar, type of residential habilitation service that Defendants themselves do not believe Doe needed or was even entitled to.

Here, per the 2003 plan and the authorization letter, DDSN found that Doe's placement at a CTH I facility would best meet her medical need for residential habilitation services in the least restrictive environment.  See 42 C.F.R. § 441.301(b)(1)(i) (requiring states providing services through the waiver program to do so pursuant to a "written plan of care subject to approval by the Medicaid agency").  Therefore, "Doe had a right to choose

14

among providers of CTH I services, not a right to choose to live in any CTH II setting she wished." Doe I, 501 F.3d at 359.

The provision of different CTH II respite services by Defendants did not somehow relieve them of their legal responsibility to subsidize Doe's placement in a suitable CTH I setting, nor did it negate her freedom of choice among CTH I providers. Thus, the ongoing failure of Defendants to pay for the CTH I residential habilitation services is the same as a failure to provide any services.

ii.

Similarly, although the parties appear deeply concerned about the subtle difference between residential habilitation and respite services, we do not believe that parsing out these distinctions will alter the outcome of this case. We continue to believe that Doe I was correct in so far as it held that respite services and residential habilitation services are, to some extent, distinct:

> Respite care, which Doe is currently receiving, "is furnished on a short-term basis due to the regular care giver's absence or need for relief." Benjamin H. v. Ohl, No. 3:99-0338, 1999 WL 34783552, at *2 (S.D.W.Va. July 15, 1999). Residential habilitation, which Doe has requested, "helps recipients with the skills needed for daily living, such as eating and performing personal hygiene, household chores, and food preparation. It also focuses on the social and adaptive skills which enable an individual to avoid institutionalization." Id. at *3.

15

Doe I, 501 F.3d at 354 n.3. The 2003 plan only required DDSN to provide "residential habilitation services." J.A. 625. State regulations define residential habilitation services as "the care, skills training and supervision provided to individuals in a non-institutional setting." J.A. 656. We therefore agree with Defendants that this definition includes any of those services provided in a SLP II, CTH I, CTH II or other "non-institutional" settings.

Nevertheless, this debate is inconsequential because both parties concede the more important point: that the CTH II respite services currently being provided for Doe are not equivalent to the SLP II or CTH I residential habilitation services approved by the 2003 plan and the authorization letter. (Appellant's Br. at 34-35; Appellees' Br. at 42-45.) Defendants were obligated under the Medicaid Act and its regulations to provide Doe with the needed services in the least restrictive environment. Doe I, 501 F.3d at 359. As conveyed in the authorization letter, after evaluating Doe and consulting with her representatives in the development of the 2003 plan, DDSN determined that Doe should receive residential habilitation services in either a SLP II or CTH I setting. Both parties concede that Doe has never actually received these services in the designated setting. (Appellant's Br. at 34-36; Appellees' Br. at 43-45.) It is also undisputed that, after Doe rejected

16

the Babcock center in 2003, Defendants have never offered Doe any other satisfactory CTH I placements. (Appellant's Reply Br. at 17; Appellees' Br. at 45.) Instead, since 2003, Doe has only received "temporary" or respite services at a more restrictive CTH II facility. (Appellant's Br. at 34-35; Appellees' Br. at 43-45.)

Notwithstanding Defendants' arguments to the contrary or even Doe's own insistence that a CTH II setting may be more desirable, we reaffirm the holding of Doe I as to Defendants' obligations and Doe's rights under the Medicaid Act: (1) Defendants were to make a determination as to the proper level of care, here, a CTH I setting; (2) Doe was then within her rights to refuse to accept the Babcock center, the first suggested CTH I facility; and (3) Defendants were then obligated to present her with "feasible alternatives" for the provision of residential habilitation services at a suitable care facility of her choice. 42 U.S.C. § 1396n(c)(2)(C); see also 42 C.F.R. § 441.302(d)(2) (waiver program participants are to be "[g]iven the choice of either institutional or home and community-based services."). Despite these unambiguous legal mandates, Defendants never presented Doe with any alternative SLP II or CTH I placements.

Indeed, Defendants admit that they abdicated their responsibility to furnish Doe with the necessary services in the

17

least restrictive environment, i.e., a SLP II or CTH I setting, based upon the whims of Doe's representatives. (Appellee's Br. at 49-50.) However, as Defendants successfully argued in Doe I, it was ultimately Defendants' responsibility to decide the appropriate setting for Doe and to execute the 2003 plan within that setting. 501 F.3d at 359. Neither of these matters fell upon Doe or her representatives to decide or implement. Thus, it is irrelevant that, after DDSN refused to upgrade services at the only CTH I placement proposed by it or to recommend another CTH I setting, Doe's representative sought a more restrictive CTH II level of care. The law places the burden on Defendants to work with Doe to find or establish an acceptable SLP II or CTH I setting, which, so far, they have utterly failed to do.

We therefore hold that, as a matter of law, Defendants have violated the Medicaid Act through their ongoing refusal to finance residential habilitation services at an acceptable CTH I placement of her choice.

iii.

Even with the abandonment of her damages claim on appeal, it is still within the equitable powers of the courts to order Defendants to place Doe in an appropriate SLP II or CTH I program of her choice. In actions brought under § 1983 in the context of the Medicaid Act, the district courts are invested with broad equitable powers to style any appropriate remedial

18

relief.  See Alexander v. Hill, 707 F.2d 780, 783 (4th Cir. 1983) (permitting a district court to exercise its broad equitable powers in fashioning a remedy to address the continuing failure of a state to comply with Medicaid regulations); Smith v. Miller, 665 F.2d 172, 175 (7th Cir. 1981) (concluding that no provision of the Medicaid Act or the Constitution restricts the authority of the courts to award equitable relief).

Since 2005, DDSN has declared Doe ineligible for Medicaid benefits, but continues to provide her with services pending her administrative appeal.  Accordingly, Defendants assert that any equitable relief provided to Doe would be futile since she is no longer entitled to benefits, and that, even if her benefits were later reinstated, any judgment finding that her benefits had been provided with unreasonable delay would be meaningless. (Appellees' Br. at 27-28.)  However we note that, even now, Doe continues to receive services.  And, if Doe were to ultimately win her state appeal, she would be entitled to future services.

We therefore find that it would be quite appropriate and within the equitable powers of the district court to order Defendants to finance a SLP II or CTH I placement of Doe's choice pending the resolution of the state appellate process. Alternatively, the district court may issue a declaratory

19

judgment consistent with this opinion that may guide Defendants should Doe ever become eligible for Medicaid services again.[4]

iv.

Thus, having dispensed with all of Defendants' arguments, we hold: (1) that Defendants never provided Doe with residential habilitation services in a SLP II or CTH I setting; (2) that the CTH II respite services that have been provided to Doe since July 2003 are not the equivalent of the SLP II or CTH I residential habilitation services to which she is entitled; and (3) that, given Defendants' continuing violations of the timeliness provisions of the Medicaid Act and its regulations, they are ordered to provide Doe with services in a SLP II or CTH I facility of her choice (at least pending the outcome of her state appeal).

B.

"Ordinarily, we review an award of attorney's fees for abuse of discretion." Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 274 (4th Cir. 2002). However, a determination of whether

---

[4] Because Doe seeks only prospective relief to end the ongoing violation of the Medicaid Act by state officials, there is no danger that the issuance of an injunction or a declaration would disturb State sovereignty. See Bragg v. West Virginia Coal Ass'n, 248 F.3d 275, 292 (4th Cir. 2001) ("[T]he Eleventh Amendment does not preclude private individuals from bringing suit against State officials for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law.").

Doe is the "prevailing party" for purposes of 42 U.S.C. § 1988 is a question of law to be considered de novo. Id. "A person may not be a 'prevailing party' plaintiff under 42 U.S.C. § 1988 except by virtue of having obtained an enforceable judgment, consent decree, or settlement giving some of the legal relief sought in a § 1983 action." S-1 and S-2 By and Through P-1 and P-2 v. State Bd. of Educ. of N. Carolina, 21 F.3d 49, 51 (4th Cir. 1994) (en banc) (citing Farrar v. Hobby, 506 U.S. 103 (1992)).

Because we now reverse the district court, and direct it to grant summary judgment in her favor, there can be no question that Doe is the "prevailing party" for purposes of § 1988. She is therefore entitled to reasonable attorney's fees as determined by the district court. See Hanrahan v. Hampton, 446 U.S. 754, 758 (1980) ("Congress intended to permit the interim award of counsel fees . . . when a party has prevailed on the merits of at least some of his claims.").

### C.

Denial of leave to amend is subject to appellate review for abuse of discretion. US Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312, 320 (4th Cir. 2010). We agree with the district court's decision to deny Doe's motion to amend the complaint.

Doe's proposed amended complaint would have added three causes of actions based upon the Due Process Clause, Equal

21

Protection Clause, and Supremacy Clause. These ostensibly new causes of action sought to revive her earlier "freedom of choice" claim, i.e., that she should be allowed to choose between CTH I and CTH II services, and to collaterally attack the now pending state administrative proceedings as to her Medicaid eligibility.

Given our prior dismissal of her "freedom of choice" claim, we find that the first proposed due process claim, in so far as it alleges that state administrative hearings failed to consider certain medical evidence as to the suitability of a CTH I placement, would be futile. See GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 548 (4th Cir. 2001) ("Leave to amend may properly be denied where amendment would be futile."). Moreover, this proposed amendment was brought before the court in 2008, long after the allegedly faulty hearing occurred in 2006. See Deasy v. Hill, 833 F.2d 38, 41 (4th Cir. 1987) ("[A] motion to amend should be made as soon as the necessity for altering the pleading becomes apparent." (quoting 6 Wright & Miller, Federal Practice and Procedure § 1488 (1971)).

The district court also did not abuse its discretion when it rejected the amendments that would have added a second due process claim challenging the timeliness of the hearing officer's decision making process, and a third claim arising

22

under the Equal Protection Clause and Supremacy Clause, wherein Doe alleged that Defendants and the state proceedings somehow misapplied federal law. "[L]ower federal courts possess no power whatever to sit in direct review of state court decisions." Atlantic Coast Line R. Co. v. Engineers, 398 U.S. 281, 296 (1970). This rule is particularly important where "the constitutional claims presented to a United States District Court are inextricably intertwined with the state court's denial in a judicial proceeding" of a plaintiff's request for relief. Dist. of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482 n.16 (1983); see also Johnson v. DeGrandy, 512 U.S. 997, 1005-06 (1994) (noting that the Rooker-Feldman doctrine prevents an unsuccessful state court party "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights").

In Feldman, the plaintiffs sought to challenge a D.C. Court of Appeals decision denying them permission to sit for the local bar exam. Id. at 468-469. The Supreme Court allowed the plaintiffs to proceed with a constitutional challenge to the local bar rules generally. Id. at 486-87. However, it held that the plaintiffs could not ask the district court to directly review the D.C. Court of Appeals' judicially made determination

that the plaintiffs were ineligible to sit for the bar exam. Id.

Here, the district court could not have adjudicated Doe's constitutional claims without also reviewing the propriety of the judicial rulings of the hearing officer, the South Carolina administrative law judge, and any subsequent state appellate courts. Unlike Feldman, these new claims did not challenge the constitutionality of a particular procedure or law related to Medicaid eligibility. See id. at 486 (holding that district courts may review state law or those rules promulgated by a state executive or judiciary acting in a non-judicial or legislative manner). Doe merely alleges that the hearing officer -- who clearly acted in a judicial capacity by issuing an opinion in which he weighed the evidence and applied the applicable law -- and the administrative law court judge made their decisions in an arbitrary and capricious manner. Thus, she seeks to collaterally attack these state court judicial proceedings by asking the federal courts to again review the evidence and to then overturn these state court judgments. This we cannot and will not do. See id. (holding that district courts "do not have jurisdiction . . . over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional").

24

Doe was permitted under S.C. Code Ann. § 1-23-380(5)(a) to raise her constitutional claims before the South Carolina administrative law court. She also could have raised her concerns about the purported retaliatory nature of Defendants' reevaluation. If, following these state proceedings, her Medicaid eligibility continues to be denied in a way she deems unconstitutional, then appellate review by the state courts and, perhaps, ultimately, the United States Supreme Court is her only recourse. We are confident that the South Carolina courts will thoughtfully and thoroughly consider these claims.

For these reasons, we believe that the court did not abuse its discretion when it declined to allow Doe to amend her complaint.

III.

We reverse the district court's grant of summary judgment, and hold that Defendants violated Doe's rights under the Medicaid Act by failing to provide her with any of the residential habilitation services in a SLP II or CTH I setting, as authorized by DDSN and the 2003 plan, with reasonable promptness. Because Defendants have failed to demonstrate any disputed issue of material fact, we grant Doe's motion for summary judgment. We also find that Doe is entitled to

25

attorney's fees. However, we affirm the district court's denial of Doe's motion to amend the complaint.

Thus, the order of the district court granting summary judgment for Defendants is reversed; Doe's motion for summary judgment is granted; the district court's denial of the motion to amend is affirmed; and we remand the case to the district court to devise appropriate remedial relief, and to determine reasonable attorney's fees pursuant to § 1988.

REVERSED IN PART, AFFIRMED IN PART,
AND REMANDED WITH INSTRUCTIONS